HALBROOKS, Judge
On appeal from his conviction of fifth-degree possession of a controlled substance, appellant argues that the district court erred by denying his motion to suppress evidence removed from appellant's rectum by a medical doctor. Appellant argues that the medical procedure was unreasonable under Winston . We affirm.
FACTS
In the course of a narcotics investigation focused on crack cocaine, Minneapolis police *898 set up a controlled buy from appellant Guntallwon Karloyea Brown. After a successful purchase by a confidential informant, officers observed Brown make two hand-to-hand transactions with third parties. During a subsequent investigative stop, an officer saw Brown "shoving his hands down his pants," which suggested that he might be concealing something. Brown was arrested.
At the police station, police observed Brown "grinding his buttocks" against his chair in a back and forth motion. Brown then stood up, straddled the chair rail, and ground his butt cheeks into it. An officer told Brown to stop, believing that he was "attempting to jam narcotics up his rectum." After moving Brown into an interview room, the officer observed Brown "taking his hands and shoving ... kind of between his legs, shoving upwards." Based on his training and experience, the officer believed that Brown was trying to insert something into his rectum. A strip search revealed clear plastic sticking out of Brown's anus. Based on all of the above information, police applied for and obtained a warrant authorizing a search of Brown's person and transported him to North Memorial Hospital to execute it. In the emergency department, Christopher Palmer, M.D., performed an external body search and did not see anything protruding from Brown's anus. Dr. Palmer offered Brown a liquid laxative, but he refused it. After consulting the hospital's legal counsel, Dr. Palmer declined to administer a laxative or perform any procedure to remove the suspected narcotics without Brown's consent.
Police then applied for and obtained a more specific search warrant from the same district court judge who had granted the first warrant. The second warrant expressly authorized hospital staff to "use any medical/physical means necessary to have Brown vomit or defecate the contents of his stomach or physically by any means necessary remove the narcotics from the anal cavity so Officers can retrieve the narcotics." Police transported Brown to the emergency department at Hennepin County Medical Center (HCMC), where Paul Nystrom, M.D., reviewed the warrant and consulted the hospital's legal counsel about his rights and obligations. Dr. Nystrom understood the warrant to authorize the removal of the narcotics through any medically reasonable means but not to compel him to act if he was ethically opposed. His assessment was that leaving cocaine in the rectum had the potential to cause serious complications or death, but that no medical emergency existed at the time.
Dr. Nystrom offered Brown four options to remove the suspected narcotics: (1) Brown could remove the bag himself, (2) Dr. Nystrom could administer an enema,[1] (3) Dr. Nystrom could sedate Brown and perform an anoscopy, or (4) Dr. Nystrom could put Brown on a ventilator and insert a nasogastric tube to deliver a laxative that would "eventually clear his bowels." After explaining the different procedures and associated risks, Dr. Nystrom recommended options one or two. Dr. Nystrom told Brown that if he did not select an option, they would proceed with a sedated anoscopy. Brown remained silent.
After giving Brown time to consider his options, and because the first two options required Brown's participation, which was not forthcoming, Dr. Nystrom elected to proceed with the third option-sedation and anoscopy. Dr. Nystrom concluded that, absent Brown's cooperation, anoscopy was the safest and most conservative means of removal. He described the procedure *899 as the insertion of a speculum in the rectum to allow inspection of the four quadrants. The procedure is typically done to look for internal bleeding or hemorrhoids, but can also be used to remove a foreign body. Dr. Nystrom explained that the speculum is "like the size of a large bowel movement, so it's not comfortable," but it allows visualization of "whatever it is you're worried about." The procedure takes "a couple of minutes," and then the speculum is removed. He testified that although sedation is not always required for anoscopy, relaxation makes the procedure, "less painful, less uncomfortable."
After another medical doctor sedated Brown intravenously with Propofol, Dr. Nystrom inserted the anoscope and conducted a visual inspection, but he did not immediately see anything. Taking a second look, he saw the edge of a plastic bag. Using Magill forceps, Dr. Nystrom removed the bag and handed it to police. Later testing confirmed that the bag contained 2.9 grams of crack cocaine.
The state charged Brown with fifth-degree crack-cocaine possession under Minn. Stat. § 152.025, subd. 2(a)(1) (2014). Brown moved to suppress the evidence, arguing that the procedure by which the cocaine was removed violated his constitutional right against unreasonable searches and seizures. At a Rasmussen hearing, Dr. Palmer and Dr. Nystrom both testified. The district court denied Brown's suppression motion, applying the three-factor Winston test and concluding that, although it was a close call, the procedure was reasonable under the circumstances. After a jury trial, Brown was convicted. This appeal follows.
ISSUE
Under the circumstances presented in this case, did an unconsented sedated anoscopy violate Brown's right to be free from unreasonable searches?
ANALYSIS
Brown argues that the district court erred by denying his motion to suppress the crack-cocaine evidence, reasoning that under the Supreme Court's decision in Winston , the anoscopy procedure was an unreasonable search. In reviewing a district court's pretrial ruling on a suppression motion, appellate courts review factual findings for clear error and legal determinations de novo. State v. Gauster , 752 N.W.2d 496, 502 (Minn. 2008).
The United States Constitution and the Minnesota Constitution prohibit unreasonable searches and seizures. U.S. Const. amend. IV ; Minn. Const. art. I, § 10. "The Fourth Amendment protects expectations of privacy." Winston , 470 U.S. at 758, 105 S.Ct. at 1615 (quotation omitted). "[T]he ultimate touchstone of the Fourth Amendment is reasonableness." Riley v. California , --- U.S. ----, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014) (quotation omitted). The Fourth Amendment does not forbid all bodily intrusions. Winston , 470 U.S. at 760, 105 S.Ct. at 1616. But some bodily intrusions implicate expectations of privacy of such a magnitude that a search may be unreasonable even if it is supported by probable cause. Id. at 759, 105 S.Ct. at 1616. The Fourth Amendment's "proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." Id. at 760, 105 S.Ct. at 1616.
Assuming threshold probable-cause and search-warrant requirements are met,[2] Winston articulates three factors that *900 courts should consider when determining whether a medical-procedure search is reasonable: (1) "the extent to which the procedure may threaten the safety or health of the individual," (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity," and (3) "the community's interest in fairly and accurately determining guilt or innocence." 470 U.S. at 761-62, 105 S.Ct. at 1617-18. In Winston , the issue was whether an unconsented chest surgery, performed under general anesthesia to remove a bullet lodged in muscle tissue, was reasonable under the Fourth Amendment. Id. at 759, 105 S.Ct. at 1615. The state's theory was that a shooting and attempted-robbery victim had shot in self-defense, striking the suspect in his left side, and that confirming the bullet's origin would be useful to the prosecution. Id. at 755-56, 105 S.Ct. at 1614.
Applying the first factor, the Supreme Court contrasted the risks of chest surgery with the blood draw at issue in Schmerber v. California , 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Id. at 761-64, 105 S.Ct. at 1617-18. It also considered the uncertainty of the surgery's risks based on a "sharp dispute" over the extent of probing required to locate the bullet; the risk of injury to muscle, nerves, blood vessels, and other tissue in the chest and pleural cavity; and the risk of infection. Id. at 764, 105 S.Ct. at 1618. The Court concluded that uncertainty about those risks militated against a finding that the surgery was reasonable. Id. at 766, 105 S.Ct. at 1619.
With respect to the second factor, the Supreme Court observed:
When conducted with the consent of the patient, surgery requiring general anesthesia is not necessarily demeaning or intrusive. In such a case, the surgeon is carrying out the patient's own will concerning the patient's body and the patient's right to privacy is therefore preserved. In this case, however, ... the Commonwealth proposes ... to drug this citizen-not yet convicted of a criminal offense-with narcotics and barbiturates into a state of unconsciousness, and then to search beneath his skin for evidence of a crime.
Id. at 765, 105 S. Ct. at 1619 (quotation omitted). In considering the third factor, the Supreme Court determined that although the bullet may have been useful to the state in identifying the suspect as the robber, the availability of other "substantial evidence of the origin of the bullet," including a spontaneous identification of the suspect by the victim at the hospital where both were being treated, diminished the state's need for the evidence. Id. at 765-66, 105 S.Ct. at 1619.
In sum, the Supreme Court concluded that the unknown medical risks and severe bodily intrusion weighed against the state and that the state had failed to demonstrate a compelling need for the evidence. Id. at 766, 105 S.Ct. at 1619-20. The Supreme Court therefore concluded that compelling surgery to remove the bullet was unreasonable under the Fourth Amendment. Id.
Brown contends that application of the Winston factors requires the same conclusion with respect to the anoscopy performed here.
1. The extent to which the procedure may threaten safety or health.
Brown maintains that the risks of anal bleeding and tearing make this procedure unreasonable. Dr. Nystrom testified that "there is a possibility of bleeding because it stretches the anus like a large bowel movement would." Both doctors testified that anoscopy poses minimal health risks and is not a complicated procedure.
*901 In its order denying Brown's suppression motion, the district court concluded that the procedure falls in the "slight/mild risk category," and therefore this factor favors the state. In doing so, the district court reasoned that other courts have held that similar procedures do not pose a significant risk. See Eckert v. City of Deming , CIV 13-0727 JB/WPL, 2015 WL 10383783, at *41 (D.N.M. Oct. 31, 2015) (collecting cases). The district court also noted that, unlike in Winston , the risks here were not unknown.
Based on the record before us, we conclude that the risks of anoscopy fall closer to the blood draw in Schmerber than the proposed chest surgery in Winston . Both doctors testified that anoscopy poses minimal health risks, and that it is not a complicated procedure. The procedure is performed regularly at HCMC. And as the district court observed, there is no conflicting testimony here as to risks. Cf. Winston , 470 U.S. at 764, 105 S.Ct. at 1618 (determining that conflicting testimony on risks militated against finding surgery reasonable). Thus, the first Winston factor favors a conclusion that the procedure here was reasonable.
2. Intrusion upon dignitary interests in personal privacy and bodily integrity.
Brown argues that nothing could be more intrusive upon a person's dignitary and privacy interests than forced sedation and the probing of his rectum. The district court concluded that this factor favored Brown, reasoning that the anoscopy procedure was "an extreme violation of Brown's dignitary interests in personal privacy and bodily integrity" because he was "restrained, sedated, and forced to undergo the anoscopy." The state concedes that, on balance, this factor favors Brown. We agree. The district court properly determined that "the procedure was demeaning, humiliating, and an infringement on Brown's dignitary interests." This factor favors a conclusion that the procedure was unreasonable.
3. Community's interest in fairly and accurately determining guilt or innocence.
Brown argues that, although the cocaine may have been the state's best evidence of guilt, this need does not override the first two Winston factors. He acknowledges that the third factor is "of great importance" and that "courts should take into account the difficulty of proving the charge without the evidence."
The district court determined that the third Winston factor favors a finding of reasonableness. We agree. The district court found that the community has a strong interest in prosecuting those who sell illegal drugs on street corners. Brown does not dispute this finding. Significantly, unlike in Winston , the evidence sought here was the state's only direct evidence of crack-cocaine possession. And the district court took into account that the anoscopy was performed under the authority of a valid search warrant.
Brown urges us to follow two federal circuit courts- United States v. Gray , 669 F.3d 556 (5th Cir. 2012), judgment vacated on other grounds by Gray v. United States , 568 U.S. 802, 133 S.Ct. 151, 184 L.Ed.2d 2 (2012), and United States v. Booker , 728 F.3d 535 (6th Cir. 2013) -that applied the Winston factors and found similar procedures to remove narcotics unreasonable under the circumstances present in those cases. Although we are not bound to follow federal caselaw, it can be persuasive. State v. Burnett , 867 N.W.2d 534, 537 (Minn. App. 2015), review denied (Minn. Oct. 20, 2015). But the Winston analysis is highly fact-specific, and Gray *902 and Booker are not as helpful as Brown urges us to conclude.
In Gray , the Fifth Circuit found a similar procedure to remove narcotics-a proctoscopic examination following x-rays and a digital rectal examination-to be unreasonable, in part because "there were other available avenues for obtaining [the] evidence, such as a cathartic or an enema." Gray , 669 F.3d at 565. It nevertheless applied the good-faith exception to the exclusionary rule and declined to suppress the evidence. Id . at 566. Here, Dr. Nystrom advised Brown of less-intrusive options, advised him to select one of those options, and then performed the most conservative option that did not require Brown's cooperation. In any event, the Supreme Court has "repeatedly refused to declare that only the least intrusive search practicable can be reasonable under the Fourth Amendment." Vernonia Sch. Dist. 47J v. Acton , 515 U.S. 646, 663, 115 S.Ct. 2386, 2396, 132 L.Ed.2d 564 (1995) (quotation omitted). We note that, unlike the federal courts, the Minnesota Supreme Court has not recognized the good-faith exception to the exclusionary rule in this context. See State v. Lindquist , 869 N.W.2d 863, 876 (Minn. 2015) (adopting good-faith exception to exclusionary rule when law enforcement acts in objectively reasonable reliance on binding appellate precedent but noting that "nothing in our opinion should be construed as authorizing the application of exceptions we have not explicitly adopted"). And in Booker , a procedure closer in nature to Dr. Nystrom's fourth option was performed without the benefit of a search warrant. Booker , 728 F.3d at 537-38.
Brown argues that the presence of a search warrant is irrelevant to our Winston analysis. We disagree. Although a search warrant or applicable exception is a separate, threshold requirement, the existence of a valid search warrant also informs our analysis of reasonableness under the circumstances here. Both the United States Supreme Court and the Minnesota Supreme Court have advised that searches involving intruding into someone's body for evidence should be conducted under a warrant. In Winston , for example, the Supreme Court repeated what it had said in Schmerber :
"Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned. ... The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great."
Winston , 470 U.S. at 761, 105 S.Ct. at 1617 (quoting Schmerber , 384 U.S. at 770, 86 S.Ct. at 1835 ). The Minnesota Supreme Court has expressed the same requirement for body searches, stating that "[a]bsent unusual circumstances, an intrusion upon the body of a citizen should properly be made only by authority of a warrant issued by a magistrate, for it is a search and seizure within the limitations of the Fourth Amendment." State v. Campbell , 281 Minn. 1, 10, 161 N.W.2d 47, 54 (1968).
Here, a neutral and detached magistrate considered the evidence in support of the search-warrant application and granted the warrant not once but twice. The second search warrant specifically addressed the means by which the evidence could be obtained. Although it did not identify the exact medical procedure to be employed, it directed that "medical/physical means" be used to "remove the narcotics from the anal cavity." Because the issuing magistrate necessarily considered the reasonableness of medical intervention to obtain the evidence, the district court here did *903 not err in according some deference to the issuing magistrate in making its own assessment. We do not foreclose the possibility that a medical procedure could be unreasonable despite the presence of a valid search warrant supported by probable cause. But on this record, the existence of a search warrant is relevant to the analysis. In sum, given the community's interest in prosecuting narcotics sellers, the importance of the evidence to the state's case, and the grant of a search warrant, we conclude that the third Winston factor favors a determination that the procedure here was reasonable.
After balancing the three Winston factors, we conclude that the district court properly determined, in a comprehensive and thoughtful decision, that the anoscopy procedure was reasonable under the circumstances.
DECISION
Because the procedure was reasonable under the Winston test, the district court did not err in denying the motion to suppress the evidence obtained.
Affirmed.

Dr. Nystrom described an enema as fluid administered in the rectum.

Brown does not challenge the validity of the search warrant.